IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMIE LEE HOLSTEN,

                              Plaintiff,

        v.                                                    OPINION and ORDER

KILOLO KIJAKAZI,                                              22-cv-578-jdp
Acting Commissioner of the Social Security
Administration,

                              Defendant.

---

Plaintiff Jamie Lee Holsten seeks judicial review of a final decision of defendant Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, finding that Holsten was not disabled within the meaning of the Social Security Act. Holsten's appeal focuses on her mental health impairments, including schizoaffective disorder and post-traumatic stress disorder.

The parties agree on some basic facts: (1) Holsten was unable to work while she was using heroin and methamphetamines; (2) Holsten's mental health improved in 2020 when she became sober; and (3) Holsten continued suffering from mental health symptoms even after becoming sober. The parties dispute whether Holsten improved *enough* after she became sober to support a finding that her drug addiction was the primary cause of her disability.

Holsten's contentions can be grouped into two categories: (1) administrative law judge Guila Parker (ALJ) did not accurately summarize the evidence of Holsten's mental impairments; and (2) the ALJ placed too much weight on the opinion of the consulting psychologists and not enough weight on a nurse who treated Holsten.

The ALJ's view of the evidence may have been somewhat rosy. She did not discuss every symptom that appeared somewhere in Holsten's 2,000 pages of medical records, and she emphasized the progress that Holsten made after becoming sober rather than focusing on temporary setbacks. But an ALJ's decision does not have to be perfect, and the ALJ does not have to draw all inferences in the claimant's favor. So long as the ALJ discusses all the important evidence and provides some reasoning to explain her decision, this court must defer to the ALJ, even if other reasonable interpretations of the evidence would support a different finding. The ALJ's decision meets that standard, so the court will affirm the decision.

## BACKGROUND

Holsten applied for disability insurance benefits, alleging disability beginning in September 2018 R. 17.[1] In an April 2022 decision, the ALJ found that Holsten suffered from the following severe mental impairments: a schizoaffective disorder, a generalized anxiety disorder, a personality disorder, post-traumatic stress disorder, and a polysubstance addiction disorder. *Id*. The ALJ also found that Holsten suffered from physical impairments, but those are not at issue in Holsten's appeal.

When the ALJ considered Holsten's impairments in the context of her drug addiction, the ALJ concluded that Holsten met the requirements for disability under Listing 12.15, which is for disorders related to trauma and stress. R. 18. But the ALJ found that Holsten was not disabled when she was sober. Specifically, the ALJ found that Holsten had the residual

---

[1] Record cites are to the administrative transcript located at Dkt. 8.

functional capacity (RFC) to perform light work when she was not using drugs. R. 21. The

ALJ's RFC assessment included the following restrictions related to Holsten's mental health:

- no more than moderate noise intensity

- simple tasks only

- no jobs that require more than two hours of sustained concentration, persistence, and pace

- only low-stress jobs, defined as jobs that require no more than occasional work-related decisions and no more than occasional changes in the work setting

- no more than occasional interaction with supervisors and coworkers

- no tandem tasks with coworkers

- no more than brief interaction with the public.

R. 21–22.  Relying on the testimony of a vocational expert, the ALJ found that Holsten was

not disabled because she could perform jobs that are available in significant numbers in the

national economy, such as housekeeper, marker, and routing clerk, when she was not using

drugs. R. 28. The Appeals Council declined review. R. 1–7.

Holsten now appeals to this court. On appeal, the court's role is to review the ALJ's

decision for legal errors and to determine whether the decision is supported by substantial

evidence. *See Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). The substantial evidence

standard is not high and requires only "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Id*. But the ALJ's decision must identify the

relevant evidence and build a "logical bridge" between that evidence and the final

determination. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

ANALYSIS

The ALJ's key task as relevant to this appeal was untangling Holsten's mental health impairments from her drug addiction. This is because the law places special limits on obtaining disability benefits when the claimant is a drug user. Under 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." The statute is somewhat convoluted, but the court of appeals has given it a straightforward interpretation: "When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).

In concluding that Holsten would not be disabled in the absence of her substance abuse, the ALJ relied primarily on evidence from the times that she was sober. Holsten does not challenge that approach. In fact, both sides' briefs frame the overarching issue as whether the evidence from the time that Holsten was sober supports a finding that she could maintain full-time work. The court will follow the parties' lead and focus on the two issues that Holsten raises: (1) the ALJ did not accurately summarize the medical records; and (2) the ALJ did not properly weigh the medical opinions.

## A. Summary of the medical records

Holsten contends that the ALJ erred by disregarding and mischaracterizing medical records that were favorable to her disability claim. Holsten's arguments can be grouped into four issues: (1) the frequency and severity of her visual and auditory hallucinations; (2) her ability to maintain relationships; (3) limitations on her ability to concentrate; (4) the frequency

4

and severity of other symptoms, such as mood swings, difficulty sleeping, and side effects of medication.

### 1. Hallucinations

The ALJ acknowledged multiple times that Holsten continued suffering from both visual and auditory hallucinations even after she became sober in July 2020. R. 23–24. But the ALJ said that Holsten "reported [the hallucinations] as off and on while medicated, if not substantially decreased, unless discussing her traumas in therapy or stressed." R. 25. From this, the court understands the ALJ's view to be that Holsten's hallucinations were not frequent or severe enough to keep her from working, so long as Holsted was restricted to low-stress work. Holsten says that the ALJ is mischaracterizing the record, alleging that "Holsten almost universally reported her hallucinations were bad." Dkt. 10, at 21.

A threshold problem with Holsten's argument is that she does not identify any additional restrictions that the ALJ should have included in the RFC assessment to account for her hallucinations, and she doesn't otherwise explain in her opening brief how her hallucinations affect her ability to work. As this court has explained before, suffering from hallucinations doesn't necessarily mean that a person is disabled. *See Schmidt v. Kijakazi,* No. 21-cv-511-bbc, 2022 WL 3367762, at *7 (W.D. Wis. Aug. 16, 2022). What matters is the severity and frequency of those hallucinations, and the effect they have on the claimant. So Holsten was required to do more than "point[] to medical records indicating that plaintiff reported hallucinations." *Id.*[2]

---

[22] Holsten did not acknowledge *Schmidt* in her briefs, even though Holsten's counsel also represented the plaintiff in *Schmidt*, which was decided only a few months before counsel filed his opening brief in this case. Counsel is reminded that his briefs must acknowledge contrary decisions from this court. *See Luzar v. Saul*, No. 19-cv-1018-jdp, 2020 WL 5249225, at *1

Holstein relies on *Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010), and *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011), but neither case holds that hallucinations are necessarily disabling. In *Spiva*, the claimant believed that evil spirits were telling him to harm other people, but the ALJ concluded that he could perform jobs that required interaction with customers. 628 F.3d at 649–51. So there was an obvious conflict between the claimant's symptoms and the RFC. In *Scott*, the court did not address the question of when hallucinations are disabling. Rather, the court observed that an ALJ should not assume that hallucinations won't interfere with work simply because they occur mostly at night, reasoning that some jobs occur at night, and symptoms that interfere with sleep could interfere with work. *Scott*, 647 F.3d at 741. Neither *Spiva* nor *Scott* relieves plaintiff of the burden to identify limitations caused by a particular symptom. *See Gedatus v. Saul,* 994 F.3d 893, 905 (7th Cir. 2021) (rejecting claimant's contention that the ALJ erred by failing to discuss her tremors because "she has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations").

In her reply brief, Holsten cites her own hearing testimony that she doesn't "like going out in public" because of the hallucinations, that she has "to stop what [she's] doing and take a break" when she has a hallucination, and that she sometimes cries or yells because of the hallucinations. R. 50–51. This suggests that Holsten believes that her hallucinations would prevent her from having even occasional interaction with coworkers and from maintaining concentration even on simple tasks. The court need not decide whether Holsten forfeited this

_____

(W.D. Wis. Sept. 3, 2020); *Hartman v. Saul*, No. 20-cv-207-jdp, 2021 WL 1422794, at *2 (W.D. Wis. Apr. 15, 2021).

issue by failing to explain in her opening brief how her hallucinations limit her. Either way, the ALJ's interpretation of the record is supported by substantial evidence.

When Holsten first became sober, she reported to her medical providers that her hallucinations waxed and waned for a few months. In August 2020, she said that her hallucinations "are off and on," but the "last couple days they have been really bad." R. 1437. She did not explain what that meant. In September 2020, she reported hearing voices as a result of being "triggered by talking about past trauma." R. 1426. In October 2020, she said that she started hearing voices on the anniversary of a past sexual assault. R. 1429. But later in October, she said the hallucinations were "not as bad," *id.*, and by November 2020, she said they had "decreased substantially." R. 1425.

The parties do not discuss any more reports of hallucinations until two months later, in January 2021. On January 8, Holsten said that the "voices were bad and telling her to 'kill herself'" and that the "man who raped her was sitting right next to her." R. 1423. But on January 14, Holsten said that the hallucinations were "not as bad" and that "[o]verall she is doing good." R. 1422. In February 2021, she said that the hallucinations had "calmed down some" and that she had developed strategies for dealing with them. R. 1421. Specifically, she said that she had "set up boundaries with [the voices,] like they are not to interrupt her when she is talking or in a group session." *Id.*

In March 2021, Holsten had another flare up. On March 4, she said that "the voices are bad today," and "[t]hey keep telling her negative things." R. 1420. On March 22, she said that the voices are "strong sometimes," but overall she is "doing very good." R. 1418.

Holsten continued complaining about the voices in April 2021, stating on April 13 that they had "ramped up." But on April 26, Holsten said that the voices had "quieted down since getting on the new medication." R. 1412.

The administrative record includes medical records from the rest of 2021, but Holsten points to none after April 2021 in which she complained about visual or auditory hallucinations. Instead, Holsten cites three identical notations in progress notes by advanced practice nurse prescriber Jessica Stevens in July, August, and October 2021. R. 1733, 1737, 1741. Next to "Perceptions," Stevens wrote "A/V/ Hallucination, they are self depreciating." *Id.*[3] But there is no indication in any of the progress notes that Holsten was suffering from debilitating hallucinations or that they were even a concern for her.

During her July 2021 appointment with Stevens, Holsten talked about her tardive dyskinesia, being tired, "setting boundaries with her cousins," and her weight. R. 1736. Stevens observed that Holsten was "doing well today mood wise." R. 1738. Holsten spent "most of" her August appointment discussing her relationship with her romantic partner. She said that she felt "pretty good overall." R. 1740. During her October appointment, Holsten said that she is "doing well," and her "cravings have been better," but her "mood is still variable." R. 1732. None of these records suggest that Holsten was suffering from frequent or severe hallucinations that would prevent her from working.

Holsten's most recent mental-health records come from counselor Kayla Severson, who was still treating Holsten in December 2021. During these sessions, Holsten spoke about topics such as her boyfriend, her adult children, stress, feeling irritable, her previous experience being

---

[3] Presumably, Stevens meant to write "self-deprecating."

incarcerated, recovering from drug addiction, and medications, R. 1658, 1661, 1664, 1667, 1671, 1675, 1677, 1683. There is no mention in these records of hallucinations.

Reasonable minds could disagree over how to interpret the above evidence. Holsten had a rocky start after she became sober, and her progress was not uniform. The ALJ could have concluded that Holsten's multiple setbacks in the first few months after becoming sober indicated that Holsten was likely to suffer from frequent and severe hallucinations that would prevent her from working. But the ALJ's contrary conclusion was supported by substantial evidence. Holsten did make progress on reducing her hallucinations, and her setbacks were short lived. After several months, Holsten stopped complaining to her healthcare providers about her hallucinations, so it was reasonable for the ALJ to infer that they had been caused primarily by Holsten's drug use and that they were no longer debilitating.

When there are multiple reasonable interpretations of the evidence, and the ALJ adequately explains the reasons for her interpretation, the court must defer to the ALJ's decision. *Tutwiler v. Kijakazi*, No. 22-2808, —F.4th—, 2023 WL 8461648, at *4 (7th Cir. Dec. 7, 2023). "[T]he resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). The court may not reweigh the evidence, which is what Holsten is asking the court to do. The court will not remand the case based on the ALJ's discussion of Holsten's hallucinations.

## 2.  Relationships

The ALJ included the following sentence in her decision: "[Holsten's] communications with her father, children, and ex-boyfriend improved and she also worked on her relationships with the women she lived with at the group home and in group." R. 25. Holsten contends that

the record shows that Holsten's relationships did *not* improve and that the ALJ disregarded evidence that was contrary to his conclusion.

This contention suffers from multiple problems. First, as with her contention about hallucinations, Holsten doesn't explain how the ALJ's observation or any alleged inaccuracies in that observation are relevant to the RFC assessment. Presumably, Holsten believes that her personal relationships are probative of her ability to interact with coworkers, supervisors, and the public. But the ALJ included restrictions related to social interaction in the RFC, and Holsten doesn't explain why those restrictions are inadequate.

Second, Holsten mischaracterizes the ALJ's observation. The ALJ was not assessing whether Holsten's relationships improved, so citing records indicating that Holsten had conflicts with family and friends isn't evidence that Holsten mischaracterized the record. The ALJ's point was that Holsten's *communications* improved and that she "worked on" her relationships.

Third, substantial evidence supports the ALJ's conclusion. The ALJ cited treatment records that included the following information:

- Holsten "is working on better communication with the other women in the group hom[e]." R. 1436.

- Holsten "gets along with the other girls in the house." R. 1425.

- Holsten calls her dad or counselor when she "has a trigger." R. 1418.

- Holsten was "praised in treatment court for her decision making and using her skills" to avoid unhealthy living situations. R. 1417.

- When Holsten was tempted to buy drugs, she gave her car keys and her money to her dad and then called her counselor for support. R. 1417.

- Holsten left her adoptive mom's house because her sister and brother-in-law were using drugs there. R. 1415.

10

- Holsten's daughter was "trusting her again." R. 1412.

- Holsten's counselor "was proud" of the way Holsten handled a difficult family situation. R. 1408.

- Holsten told her group that she was "regaining trust with her family." R. 1695.

- Holsten's counselor wrote that Holsten "continues to participate in group and engage appropriately with her peers." R. 1693.

Holsten contends that the ALJ glossed over negative interactions that Holsten with others, including a request for no-contact order by her sister, conflicts with women in her group home, and the end of a friendship. But Holsten doesn't explain how any of those matters show that she is disabled.

As for the no-contact order, Holsten's view at the time was that her sister was angry because she (the sister) was continuing to use drugs and Holsten had distanced herself as a result. R. 1408–09. That is not evidence that Holsten is disabled. Holsten suggests that the conflict is evidence that she was lying about her sister, but she cites no evidence of that. As the commissioner points out, Holsten's treatment providers took her side in the conflict. R. 1418. So the ALJ was not required to view the family conflict as evidence of greater mental limitations.

As for Holsten's relationships with the women in the group home, Holsten said she didn't want to be around them because many of them still used drugs, there was a lot of "drama" in the house, and the women were mean to her. R. 1437. This suggests that Holsten wanted to avoid an unhealthy environment, not that Holsten couldn't interact with others.

As for the ending of the friendship, Holsten doesn't point to any evidence about why it ended. The progress note indicates that Holsten was concerned that her friend's son and

girlfriend smoked marijuana while Holsten was in her friend's house. R. 1418. Regardless, there is no basis for inferring that the friendship ended for a reason suggesting that Holsten could not have any interaction with coworkers, supervisors, or the public.

Perhaps there is room for debate about whether Holsten continued to struggle with social interaction after she became sober. But it was reasonable for the ALJ to interpret the evidence to find that Holsten's communication was improving, and she was working on her relationships. And even if that were not a reasonable interpretation, Holsten hasn't shown that problems she had with her relationships demonstrated that the ALJ should have included additional restrictions in the RFC assessment.

### 3.   Ability to concentrate

Holsten challenges two aspects of the ALJ's discussion of Holsten's ability to concentrate. First, Holsten contends that the ALJ mischaracterized the record when she wrote that Holsten had "reported improvement [in her ADHD symptoms] to her provider." R. 25. Second, Holsten contends that the ALJ cherry-picked the record by failing to acknowledge difficulties that Holsten had concentrating during mental-status exams. Holsten's arguments on these issues are not persuasive.

As for Holsten's ADHD, the ALJ cited multiple progress notes in which Holsten reported that her ADHD had improved. R. 1639, 1635, 1631. Holsten points to a July 15, 2021 progress note stating that improvement "could be better." R. 1635. But Holsten doesn't explain how that note supports her claim. The fact that there is room for improvement doesn't mean that Holsten is disabled. Holsten points to no evidence that either her or her medical providers believed that her ADHD limited her in a way that prevented her from working.

As for difficulties concentrating during mental-status exams, Holsten cites three progress notes that APNP Stevens wrote in July, August, and October 2021. R. 1632–33. 1636–37, R. 1640. Those three notes included two statements relevant to Holsten's ability to concentrate. First, Stevens wrote that Holsten was "internally occupied the longer the appt went on." Second, Stevens wrote that Holsten's attention and concentration were "intact," but "as the appt went on she displayed impaired ability to concentrate on the appt and what I was saying." R. 1632–33. Stevens used identical language in all three progress notes.

Holsten is correct that the ALJ did not discuss these statements in her decision. But Holsten submitted more than 2,000 pages of medical records, so it isn't surprising that some details were left out. It is well established that an ALJ does not have to discuss every line in a progress note. *See Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). The important question is whether the ALJ disregarded evidence that could support a finding of disability. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

In this case, Holsten hasn't persuasively explained how the notes about her attention and concentration show that the ALJ's RFC assessment may be wrong. To begin with, Stevens's notes were not informative. She did not give examples of Holsten's lack of attentiveness or concentration or otherwise explain why she believed that Holsten's attention and concentration decreased as the appointment progressed. Rather, it appears that she simply cut and pasted the same observation in each progress note. *See Primm v. Saul,* 789 F. App'x 539, 545 (7th Cir. 2019) (it was harmless error for the ALJ to ignore a medical provider's "conclusory findings").

In any event, the ALJ acknowledged that Holsten had moderate limitations in concentrating, persisting, or maintaining pace, and she restricted Holsten to simple tasks to

13

account for that limitation. R. 21. Holsten doesn't explain how a limited ability to maintain attention and concentration on a lengthy conversation would affect Holsten's ability to perform jobs such as a cleaner, marker, or router clerk. The ALJ restricted Holsten to occasional interactions with coworkers and supervisors and brief interaction with the public, so the type of conversations Holsten had with Stevens are not indicative of the type of conversations she would need to have on the job.

The ALJ adequately considered possible limitations on Holsten's ability to concentrate. The court will not remand the case on this ground.

### 4.  Other symptoms

Holsten points to examples of other symptoms that the ALJ did not discuss in her decision: variable mood, sleep difficulties, feeling sedate from medication, feeling anxious, tongue darting, and stammering speech. But Holsten doesn't point to evidence that any of the above issues were frequent enough or severe enough to prevent her from working, and she doesn't identify any additional restrictions that the ALJ should have included in the RFC to account for these symptoms.

For example, Holsten cites one progress note stating that Holsten is "variable at times." R. 1633. Holsten interprets that to be a reference to her mood, but even if that's correct, there is no indication of how severe or frequent the mood swings are. The commissioner cites numerous other progress notes indicating that Holsten was not experiencing problems with her mood. R. 1427, 1432, 1437, 1631, 1632, 1635, 1636, 1639, 1640, 1641. The ALJ wasn't required to discuss one appointment when Holsten said she was experiencing mood swings.

It is the same with the other symptoms Holsten discusses. Holsten cites individual progress notes indicating that she had difficulty sleeping and was tired because of medication

she was taking. R. 1633 and R. 1637. But she cites no evidence that these were common problems that would prevent her from working. As for feeling anxious, tongue darting, and stammering speech, Holsten cites no evidence that any of those symptoms were serious enough to limit her ability to work more than what is reflected in the RFC assessment.

The bottom line is that the ALJ had a relatively optimistic interpretation of the medical records, and she could have been more thorough in discussing Holsten's symptoms. But the ALJ's view of the evidence was reasonable, and she addressed the important evidence. That was all she was required to do, so the court will affirm the commissioner's decision on these issues related to the ALJ's summary of the medical records.

## B. Medical opinions

Holsten challenges the ALJ's handling of the medical opinions related to Holsten's mental health. Specifically, Holsten says that the ALJ should not have given any weight to psychological consultants Robert Barthell and John Warren or to counselor Kayla Severson. Instead, Holsten says that the ALJ should have adopted the opinion of advanced practice nurse prescriber Jessica Stevens.[4] In reviewing the ALJ's discussion of the medical opinions, the question is whether the ALJ adequately explained how well supported each opinion is and how consistent it is with the evidence in the record. 20 C.F.R. § 416.920c(a); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022).

---

[4] The ALJ also considered the opinion of Amy Schoenoff, Holsten's psychiatric nurse practitioner. The ALJ concluded that Schoenoff's opinion was not persuasive because "it was offered at the very beginning of the claimant's sober period." R. 26. Holsten doesn't challenge this conclusion, so the court need not consider it.

### 1. Robert Barthell and John Warren

Barthell and Warren were both consulting psychologists who conducted a record review. Barthell issued his opinion in October 2020, R. 83, and Warren issued his opinion in July 2021, R. 97. Both psychologists concluded that Holsten could not work while she was abusing drugs, but both also concluded that she could perform light work with some mental limitations when she was sober.

Barthell concluded that Holsten was moderately limited in all areas of mental functioning when she wasn't abusing drugs, she could follow simple instructions, she could not sustain "extended periods" of concentration, she could not tolerate more than superficial interaction with others, and she could tolerate "routine work stress." R. 87–89. Warren's opinion was somewhat less restrictive. He concluded that when Holsten was sober she was only mildly limited in understanding, remembering, and applying information, she could sustain concentration on simple tasks, she could "relat[e] adequately with supervisors and coworkers," she could tolerate "limited" contact with the public, and she could adapt to routine changes in the workplace. R. 98–100.

The ALJ concluded that Barthell's opinion was only partially persuasive because his record review concluded only a few months after Holsten became sober, so he was unable to fully assess Holsten's level of functioning without the influence of drugs. The ALJ wrote that Warren's opinion was "more consistent with improved mental status examinations and a wider array of activities of daily living" after Holsten became sober. R. 27.[5]

---

[5] The ALJ found that Holsten's disability allegations were inconsistent with activities of daily living, such as housework, mowing the lawn, driving, shopping, and caring for her father. R. 25. Holsten doesn't challenge that conclusion.

16

Holsten contends that Social Security Ruling (SSR) 13-2p prohibited the ALJ from relying on either Barthell or Warren's opinion. She cites the following portion of the ruling: "To support a finding that DAA [drug or alcohol addiction] is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA. Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder."

Holsten construes SSR 13-2p to mean that an ALJ may not rely on an expert's opinion that a claimant would not be disabled but for her drug use unless the expert's opinion was based on medical records from a period when the claimant was not under the influence of drugs. But that's not what the ruling says. It says that the ALJ may not rely exclusively on an expert's opinion. The ALJ didn't do that here. She relied on both expert opinions and medical records from the period that Holsten was sober, so the cited portion of SSR 13-2p doesn't apply.

Even if Holsten's reading of SSR 13-2p were correct, it wouldn't change anything. The ALJ discounted Barthell's opinion because it was based largely on records from a period when Holsten was still abusing drugs. Warren considered records through at least June 2021, R. 95, a year after Holsten became sober. Holsten says that wasn't long enough under SSR 13-2p, but she points to no language in the ruling or in case law to support her view.

Holsten also says Warren did not actually review any evidence that was added to the record after Barthell's review, pointing to the phrase "no new mental source(s) identified" in Warren's report. R. 97. But Holsten doesn't explain why she interprets the word "sources" to mean "records." Social Security regulations and case law commonly refer to treatment providers

17

as "sources." *See, e.g., Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022) (citing 20 C.F.R. § 404.1527(c)(2)). And it is clear that Holsten *did* consider new medical records, because he wrote in his report, "updated medical record obtained, continues under mental treatment," and he cited new records in his report. R. 95 and 97.

The rest of Holsten's objections to Warren's opinion are a reiteration of her objections to the ALJ's summary of the evidence. Holsten says that Warren made the same mistakes in evaluating the evidence that the ALJ did. The court has already considered and overruled those objections in the previous section, so it isn't necessary to discuss them again.

### 2. Jessica Stevens

Stevens was an advanced practice nurse prescriber who treated Holsten once a month. She filled out a "mental work capacity questionnaire" about Holsten in December 2021. R. 1718–23. Among other things, Stevens concluded that Holsten had extreme limitations in concentration and marked limitations in social functioning, she would be off task more than 15 percent of the workday, and she was not capable of even low-stress jobs. *Id.* The ALJ concluded that Steven's opinion was not persuasive because "the objective record, mental status exam findings, and activities of daily living" were inconsistent with the opinion. R. 26. The ALJ also wrote that Stevens did not provide a "clear rationale" for her opinion regarding how long Holsten was likely to be off task during the workday. *Id.*

Holsten objects to the ALJ's analysis on two grounds: (1) the ALJ did "not referenc[e] Nurse Stevens['s] opinion at all"; and (2) the ALJ did not "examine the support provided by" Stevens. Dkt. 10, at 33. The court will overrule both of these objections.

Holsten's objection that the ALJ did not "reference" Stevens's opinion is simply wrong. The ALJ cited and summarized Stevens's opinion. R. 26. Holsten's objection seems to be that

the ALJ did not cite Stevens's opinion again when identifying the evidence that the ALJ believed was inconsistent with the opinion. But it would make no sense to include a citation to Stevens's opinion in the context of a discussion about contrary evidence. That was not an error.

Holsten's second objection is based on § 416.920c(a), which, as already noted, requires the ALJ to consider what support an opinion has and how consistent it is with the record as a whole. Holsten contends that the ALJ did not consider how well supported Stevens's opinion was, but that's not accurate. One of the reasons that the ALJ gave for discounting Stevens's opinion is that she didn't explain the basis for her off-task restriction.

In any event, Holsten doesn't identify any support for Stevens's opinion that the ALJ overlooked, so any error is harmless. Holsten says that Stevens provided four types of support for her opinion, but none of the items Holsten identifies actually explain the basis for Holsten's opinion, which consisted primarily of checkboxes on a form. *See Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019) (checkboxes are "less useful" than a narrative summary of an opinion).

First, Holsten says that Stevens started treating Holsten after she was sober. That might mean that Stevens was in a good position to evaluate Holsten's abilities without the influence of drugs, but the timing of her treatment is not in itself support for her opinion.

Second, Holsten says that Stevens identified Holsten's diagnoses. But a diagnosis is not a disability. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Stevens diagnosed Holsten with schizoaffective disorder, post-traumatic stress disorder, and a substance abuse disorder, all of which the ALJ acknowledged as severe impairments in her decision. Stevens did not explain how any of these diagnoses supported any of her restrictions.

Third, Holsten says that Stevens identified the treatment that Holsten received. Those are observations, not a basis for a medical opinion.

Fourth, Holsten says that Stevens wrote that "Holsten's drug use has caused permanent use damage." Dkt. 10, at 34. What Stevens actually wrote was that Holsten had "past use damage. 0 current." R. 1723. This suggests that Stevens believed that Holsten's current limitations were not caused by past drug use, but it doesn't provide support for the limitations that Stevens found.

Holsten hasn't shown that the ALJ erred in her handling of Stevens's opinion.

### 3.  Kayla Severson

Severson was a licensed professional counselor, and she began treating Holsten in June 2021. Severson did not give an opinion about Holsten's limitations and abilities, but Holsten contends that the ALJ should not have relied on Severson's mental-status examinations of Holsten because Severson was a counselor in training, and she primarily observed Holsten in a group setting. Severson's examinations were not in depth: she assessed Holsten's "overall appearance," "behavior and manner," "affect," "motor activity," and "speech." *See, e.g.*, R. 1698. Holsten identifies no reason why Severson was not qualified to make those observations. In any event, even if Severson's examinations were not considered, the ALJ's decision would still be supported by Warren and the many other medical records that the ALJ cited. That is sufficient to satisfy the substantial evidence standard.

20

ORDER

IT IS ORDERED that the decision of the commissioner is AFFIRMED. The clerk of court is directed to close the case and enter judgment in the commissioner's favor, dismissing the case with prejudice.

Entered December 20, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge